XN FINANCIAL SERVICES, INC., a
Florida Corporation,

      Plaintiff,

vs.

BRIAN CONROY, individually, and
AGENTIS INSURANCE SERVICES, INC., a
California Corporation,

      Defendants.
_____/

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

THIS CAUSE is before the Court upon Plaintiff's Motion for Temporary Injunction [DE 5], filed on February 15, 2012.  The Court has carefully considered the Motion, Defendants' Response in Opposition [DE 11], and Plaintiff's Reply [DE 14].  The parties also argued personal jurisdiction and the merits of the motion before the Court on February 28, 2012. The Court is fully advised in the premises.

## I.  PERSONAL JURISDICTION

*A.*    *Contours of Personal Jurisdiction Analysis*

As a general rule, issues relating to personal jurisdiction should be addressed before considering the merits of a plaintiff's claims because a defendant is not bound by a court's ruling if he is not subject to the court's jurisdiction.  *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F. 3d 935, 940 (11th Cir. 1997) (citing *Madara v. Hall*, 916 F. 2d 1510, 1513-14 (11th Cir. 1990)).  When a court sits in diversity under 28 U.S.C. § 1332, it must look to

the forum state's law regarding personal jurisdiction. *See, e.g.*, *Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, 701 F.2d 889, 890 (11th Cir. 1983). XN is a Florida corporation and the Defendants are California citizens. Plaintiff is suing under state law and has invoked 28 U.S.C. § 1332 for this Court's subject matter jurisdiction. Because this Court is sitting in diversity, personal jurisdiction over the Defendants depends on whether there is personal jurisdiction under Florida law.

In interpreting Florida law, the Court will analyze the issues as the Florida Supreme Court would. *United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1274-75 (11th Cir. 2009). If there is no relevant Florida Supreme Court precedent, then this Court looks to the decisions of the Florida District Courts of Appeal, unless there is a persuasive indication that the Florida Supreme Court would decide differently. *Silverberg v. Paine, Webber, Jackson, & Curtis, Inc.*, 710 F.2d 678, 690 (11th Cir.1983).

Under Florida law, a Florida court may exercise personal jurisdiction over a nonresident defendant pursuant to a two-prong test: first, whether plaintiff has alleged sufficient facts to satisfy the requirements of Florida's long-arm statute, Florida Statute § 48.193; second, whether plaintiff has demonstrated that defendant has sufficient "minimum contacts" with Florida to satisfy due process requirements. *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989). The plaintiff's allegations in the Complaint are sufficient to establish personal jurisdiction, unless the defendant challenges personal jurisdiction and supports that challenge through affidavits. *Id.* The burden then shifts to the Plaintiff to prove by affidavit the propriety of personal jurisdiction. *Id.* If the facts in the affidavits directly conflict, then the court must conduct an evidentiary hearing to resolve the directly conflicting facts. *See id.* at 503. The court

accepts the facts in the complaint as true, unless those allegations are controverted by the defendant's affidavits.  *See Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990).  In the event of a conflict, all reasonable inferences should be made in favor of finding personal jurisdiction. *See eLandia Int'l, Inc. v. Ah Koy*, 690 F. Supp. 2d 1317, 1327 (S.D. Fla. 2010).

In this case, the Court has the benefit both of affidavits and of an evidentiary hearing. The Court may make factual findings so long as the factual disputes do not decide the merits and the parties have a sufficient opportunity to develop the record. *See Bryant v. Rich*, 530 F.3d 1368, 1376 (11th Cir. 2008). Although the parties are allowed to submit facts through affidavits, those affidavits and other types of evidence are subject to second-level hearsay objections.  *See Mazer*, 556 F.3d at 1278 (using affidavits in determining personal jurisdiction, but upholding district court's exclusion of hearsay evidence within a report).  Based upon the allegations in the complaint, Conroy's affidavit opposing personal jurisdiction, XN's affidavits in support of personal jurisdiction, and evidence produced at the hearing to resolve factual conflicts, the Court will now make its findings of fact for personal jurisdiction purposes.

B.     *Facts Found for Purposes of Personal Jurisdiction*

At all relevant times, Defendant Brian Conroy ("Conroy") has been a California resident. On or about April 23, 2007, Plaintiff XN Financial Services, Inc. ("XN") hired Conroy as the Assistant Vice President of Management Liability.  Later, XN promoted Conroy to Vice President. The employment contract contained a Florida choice of law provision. Conroy worked for XN out of XN's Carlsbad, California office.  He held a resident insurance license in California and nonresident insurance licenses in at least 48 other states, including Florida.

XN is headquartered in Florida. XN pursued, underwrote, and secured business in nineteen states, including Florida. Conroy was responsible for underwriting, negotiating, and securing business and managing risks in each of these states. Annually, he underwrote, negotiated, and serviced hundreds of risks. He serviced four (4) risks in Florida.[1] Conroy may not have solicited this business originally, as it may have predated his employment with XN, but he was responsible for the renewal of these four policies every year. Florida represented 1 percent of the business XN, through Conroy, did in Florida.

Even though Conroy worked out of a California office, several human relations activities related to his work took place in Florida. Conroy reported to at least one XN officer, Robert Zobel, the Chief Financial Officer, in Florida. He reported to Zobel and others in Florida via telephonic, electronic, and mail communications. These communications related to his own employment and the employment of his subordinate staff and their payroll and payroll taxes, employee benefits, reports for the reimbursement of business expenses, claim and loss reports, and office space leases, among others. In addition, XN issued Conroy's paychecks from Florida. Later, XN delegated its payroll functions to Paychex, a third-party payroll and benefit provider in Florida.

On November 21, 2011, Conroy formed a new California corporation, Agentis Insurance Services, Inc. ("Agentis"), which is also a defendant in this action. Conroy submitted a notice of resignation from XN on November 22, 2011. He resigned on November 30, 2011.

---

[1] Conroy's affidavit states that he never operated, engaged in, or carried on business in Florida. This allegation directly conflicts with an affidavit XN submitted. At the evidentiary hearing, XN provided testimony that Conroy serviced these risks in Florida. Conroy submitted no evidence to refute this fact. Based on the evidentiary hearing, the Court finds that Conroy did engage in the business of these four risks in Florida.

*C.     Florida's Long-arm Statute*

Plaintiff argues that three different provisions of the Florida long-arm statute provide personal jurisdiction.  Each will be addressed in turn.  Furthermore, because "[e]ach defendant's contacts with the forum State must be assessed individually," *Calder v. Jones*, 465 U.S. 783, 790 (1984), the Court will come to conclusions regarding Conroy and Agentis separately.

*1. Doing Business in Florida*

The Florida long-arm statute subjects individuals to specific *in personam* jurisdiction for any cause of action arising from "operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state." § 48.193(1)(a), Fla. Stat. The first question then, is whether XN has demonstrated that Conroy was carrying on a business in Florida.  "In order to establish that a defendant is 'carrying on business' for the purposes of the long-arm statute, the activities of the defendant must be considered collectively and show a general course of business activity in the state for pecuniary benefit." *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000).

Conroy held a nonresident insurance license in Florida.  All of the human relations work for Conroy's subordinates was carried out through XN's Florida office.  Conroy communicated with the Florida headquarters regarding human relations issues.  Conroy only had four risks he managed in Florida, which represented 1 percent of his business, and there were hundreds of other risks for which Conroy was responsible.  XN alleges that Conroy formed Agentis in order to compete with XN, and as the Court has found, Agentis was created prior to Conroy's resignation from XN.

It has been suggested that if an employee of a company executes an employment contract with a Florida corporation, keeps in contact with the main office by mail, telephone, and personal visits, is paid from the Florida headquarters and submits expense vouchers to the main office, then that employee can be said to be carrying on business in Florida such that he is subject to personal jurisdiction under § 48.193(1)(a). *See Alexander Proudfoot Co. World Headquarters v. Baillie*, 584 So. 2d 183, 184 (Fla. 4th DCA 1991) (Glickstein, C.J., concurring in part and dissenting in part). In fact, at least one court has applied such a rule. In *Waldrip v. Dyal Sales Co., Inc.*, 436 So. 2d 418 (Fla. 1st DCA 1983), a company sued its former salesmen for stealing confidential information and competing with the company. *Id.* at 419. The company alleged that the salesman started competing against the company while still employed. *Id.* The salesman, though nonresidents, had frequent contact with a Florida office, such as receiving messages, using the office as a home office, processing orders for the salesman, collecting on accounts, receiving payment, and receiving supplies and information. *Id.* The court found that jurisdiction was appropriate because the company was suing about actions taken during the time they were engaging in a business in Florida, and that the cause of action arose from those activities. *Id.* at 420. XN's case against Conroy is not as strong as the *Waldrip* case, because Conroy only appears to have used XN's Florida headquarters for human relations issues, whereas the *Waldrip* salesmen used the Florida headquarters as an integral place for doing business.

Whether Conroy's Florida business is sufficient for this Court to assert personal jurisdiction is a close issue. Even assuming *arguendo* that it was sufficient, an even closer question would be whether XN's claims can be said to arise from Conroy's business in Florida. Specific personal jurisdiction "requires a causal connection between the defendant's activities in

Florida and the plaintiff's cause of action, a requirement known as 'connexity.'" *Canale v. Rubin*, 20 So. 3d 463, 466 (Fla. 2d DCA 2009). The "arising from" requirement "necessitates a 'direct affiliation,' 'nexus,' or 'substantial connection' ... between the basis for the cause of action and the action that falls under the long-arm statute." *Glovegold Shipping, Ltd. v. Sveriges Angfartygs Assurans Forening*, 791 So.2d 4, 10 (Fla. 1st DCA 2000) (quoting *Citicorp Ins. Brokers v. Charman*, 635 So. 2d 79, 82 (Fla. 1st DCA 1994)). Though the *Waldrip* court found sufficient connexity when salesman began competing against their former employer while still employed, it is nevertheless difficult to articulate how exactly Conroy's alleged solicitation of XN's California and Washington customers arose from four risks he managed in Florida coupled with Florida human resources support. Because personal jurisdiction over Conroy is much more easily established under the tortious conduct portion of the long-arm statute, this Court will not decide personal jurisdiction under § 48.193(1)(a). The foregoing analysis, however, is useful for the due process analysis discussed later.

Unlike Conroy, personal jurisdiction over Agentis under § 48.193(1)(a) is simple. XN offered no evidence to refute Conroy's affidavit that Agentis has never done business in Florida. In fact, Conroy stated that Agentis has no legal right to conduct business in Florida. [DE 11-1]. There is no personal jurisdiction over Agentis under § 48.193(1)(a).

### 2. Tortious Conduct

XN's second argument is that this Court has personal jurisdiction over Conroy and Agentis under § 48.193(1)(b). That section provides personal jurisdiction if a person commits "a tortious act within the state." The tortfeasor need not act within the state so long as the effect of the tort causes harm within the state. *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1216-17

(11th Cir. 1999). Tortious interference with business relations or tortious interference with contract causes harm in Florida when the victim is a Florida resident. *Id.* at 1217 (finding allegations in complaint of actions amounting to tortious interference with contract done out of Florida with effects felt in Florida sufficient to create personal jurisdiction in Florida); *eLandia*, 690 F. Supp. 2d at 1331 (same for business relationships); *Lehigh Tech., Inc. v. Farrah*, 2:08–cv–53–FtM–29SPC, 2009 WL 179672, at *5 (M.D. Fla. Jan. 23, 2009) (same).

In this case, XN has plainly alleged tortious interference claims. Tortious interference is an intentional tort. Its elements are (1) the existence of a business relationship in which plaintiff has legal rights, (2) knowledge by the defendants of the relationships, (3) an intentional and unjustified interference with the relationship, and (4) damage as a result of the breach of the relationship. *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1177 (11th Cir. 1994). XN has alleged that Conroy and Agentis demonstrated all of these elements. Conroy's affidavit submitted on behalf of the Defendants does nothing to refute these allegations, so the Court finds that XN established prima facie personal jurisdiction against both XN and Agentis, subject to the due process analysis below.

### 3. *Breach of K to be Performed in Florida*

For the sake of completeness, the Court will briefly discuss XN's claim that this Court has personal jurisdiction due to Florida State § 48.193(1)(g). This section allows for long-arm jurisdiction if a party breaches a contract by failing to perform an act the contract required to be performed in Florida. § 48.193(1)(g), Fla. Stat. XN argues that Conroy failed to return company property to XN's corporate headquarters in Florida. There is no denial, however, that Conroy returned it to XN's representatives in California. [DE 11-1 ¶ 8]. XN's president Daniel Anber

("Anber") testified that the materials were returned in California. The contract only required Conroy to return XN's property "to the Company or its designated representative before the employee leaves *his place of work*. [DE 1-2 at 4 (emphasis added)]. Conroy's place of work was in California, where he returned the property. There was no contractual obligation to return it to Florida. *See Hamilton v. Alexander Proudfoot Co. World Headquarters*, 576 So.2d 1339, 1340-41 (Fla. 4th DCA 1991) (finding no jurisdiction under § 48.193(1)(g) on similar facts). Therefore, Conroy did not breach a contract to be performed in Florida as XN has argued. There is no personal jurisdiction over Conroy under § 48.193(1)(g). Likewise, there is no evidence that Agentis had any contract with Plaintiff, so there is similarly no long-arm jurisdiction under § 48.193(1)(g) over Agentis.

D.     *Satisfaction of Due Process*

1.     *Minimum contacts*

After demonstrating that Florida's long-arm statute reaches Conroy and Agentis, XN must still establish that due process is met. *See Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 630-31 (11th Cir. 1996). XN must show both that the Defendants had sufficient minimum contacts with Florida and that requiring the Defendants to litigate in Florida would not offend traditional notions of fair play and substantial justice. *Id*.

Minimum contacts has three criteria: (1) the contacts must be related to the plaintiff's cause of action, (2) the contacts must involve some purposeful availment of the privilege of conducting activities within the forum, thereby invoking the benefits and protections of its laws, and (3) the contacts must make the defendant reasonably anticipate being haled into court there. *Id*. at 631. As described above, Conroy was the officer of a Florida corporation, did at least some

risk servicing in Florida, and received human resources support and paychecks from Florida. His employment agreement also contained a Florida choice of law provision. He entered into an employment contract with XN, a Florida corporation. Viewed collectively, these Florida contacts are related to XN's cause of action against Conroy, involve Conroy's purposeful availment of Florida resources, and Conroy should reasonably anticipate being haled into a Florida court as a result of these contacts.

More importantly, even if a defendant has no other contacts with a forum state, committing an intentional tort directed to a resident of the forum state will satisfy due process even in the absence of other contacts. *See, e.g.*, *Licciardello v. Lovelady,* 544 F.3d 1280, 1285 (11th Cir. 2008). Such an act meets the U.S. Supreme Court's "effects" test described in *Calder v. Jones*, 465 U.S. 783, 789-90 (1984). *See id.* at 1288. "The 'effects test' provides that due process is satisfied when the plaintiff brings suit in the forum where the 'effects' or the brunt of the harm caused by the defendant's intentional tortious activity was suffered." *eLandia,* 690 F. Supp. 2d at 1338 (citing *Licciardello*, 544 F.3d at 1285-87). Because both Conroy and Agentis allegedly directed intentional torts toward XN, a Florida corporation, minimum contacts is satisfied under the effects test.

      2.    *Traditional Notions of Fair Play and Substantial Justice*

The Court also finds that exercising personal jurisdiction over Conroy and Agentis satisfies traditional notions of fair play and substantial justice. The Court considers (1) the burdens on defendants, (2) Florida's interest in adjudicating the controversy, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in the efficient resolution of controversies, and (5) the shared interest of the states in furthering

fundamental substantive social policies.  *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1276 (11th Cir. 2002).  Although Conroy and Agentis will be burdened in litigating in Florida, it is counterbalanced by XN's interest in convenient relief.  Florida has a substantial interest in addressing intentional torts allegedly caused by nonresidents against Florida residents.  *E.g. eLandia*, 690 F. Supp. 2d at 1339.  Because of the judicial investment so far in this case, it will be efficient to resolve it here.  Finally, the states have an interest in enforcing contracts and preventing tortious interference.  Based on the foregoing, the Court finds that it will not offend traditional notions of fair play and substantial justice by exercising personal jurisdiction over Conroy and Agentis.

E.      *Corporate Shield Defense*

Before proceeding to the merits of the motion for a preliminary injunction, the Court will consider Conroy's affirmative defense to personal jurisdiction.  Florida allows for corporate employees to escape personal jurisdiction if their acts were performed in the course of their duties.  *Doe v. Thompson*, 620 So. 2d 1004, 1006 (Fla. 1993). "[I]t is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer." *Id*.

Though this defense could be sufficient to overcome personal jurisdiction based on § 48.193(1)(a), the corporate shield rule has an important exception.  It does not apply if the corporate employee commits an intentional tort.  *Thompson*, 620 So. 2d at 1006 n.1; *eLandia*, 690 F. Supp. 2d at 1332.  Because Conroy and Agentis allegedly committed an intentional tort, they are not entitled to the corporate shield defense.

*F.      Conclusion on Personal Jurisdiction*

This Court has found that it can exercise personal jurisdiction over Conroy and Agentis pursuant to Florida's long-arm statute, § 48.193(1)(b).  Exercising personal jurisdiction will not offend due process. Because the Court has personal jurisdiction over at least the tortious interference claims, it has jurisdiction over the whole of the controversy, which all arises from a common nexus.  *See Cronin v. Wash. Nat'l Ins. Co.*, 980 F.2d 663, 671 (11th Cir.1993).

## II.  Preliminary Injunction

*A.      Preliminary Injunction Evidentiary Standard*

XN sought a preliminary injunction against Conroy and Agentis under Federal Rule of Civil Procedure 65.  At the preliminary injunction stage, the evidentiary rules are relaxed.  A court may rely on affidavits and hearsay materials that would not admissible evidence for a permanent injunction, so long as the evidence is appropriate given the character and purpose of the injunction proceedings.  *See Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (citation omitted).  There was much discussion at the hearing about whether XN's president Anber, who testified, had personal knowledge of certain facts, or whether he was simply relating hearsay evidence of others.  Because of the relaxed nature of the evidentiary standard, the Court will consider Anber's evidence even if based on hearsay.[2]  Likewise, though the parties argued about the admissibility of a computer forensics report produced by Deloitte & Touche Forensic and Investigative Services, Inc., the Court finds that the affidavit and attached report may be considered at this stage.

---

[2] Some of Anber's testimony, however, was based upon mere speculation.  Such evidence will not be considered.

-12-

To obtain a preliminary injunction, Plaintiff must prove (1) substantial likelihood of success on the merits, (2) irreparable injury absent an injunction, (3) the irreparable injury outweighs whatever damage the injunction may cause the opposing party, and (4) an injunction is not adverse to the public interest.  *Citizens for Police Accountability Political Comm. v. Browning*, 572 F.3d 1213, 1217 (11th Cir. 2009).  Each of these will be discussed in turn.

     *1.*      *Substantial Likelihood of Success on the Merits*

XN presently asks the Court to enjoin Conroy from breaching the restrictive covenants contained in its employment agreement with Conroy, to enjoin Agentis from tortiously interfering with that contract, and to enjoin Conroy and Agentis from tortiously interfering with XN's business relationships.

     *a.*      *Conroy's Alleged Breach of Restrictive Covenants*

In order to prevail on a breach of contract claim, a plaintiff must demonstrate the existence of a valid contract, breach of that contract, and damages. *E.g.* Abbott *Labs., Inc. v. Gen. Elec. Capital*, 765 So.2d 737, 740 (Fla. 5th DCA 2000).  The Court will begin by setting forth the restrictive covenants in Conroy's employment agreement, and will then discuss their enforceability and whether they have been breached.

Conroy's agreement stated that he would "be making use of, acquiring and adding to confidential information of a unique nature and value affecting and relating to" XN. "Confidential information" is defined to include, in part,

the operation of the Company's Business, the identity and extent of the Company's relationships with its customers, clients and insured parties, files, data, customer lists and any other records or information relating to the Company's insured parties or the Company's Business, the Company's business practices, methods and operations, marketing strategies and expansion plans, the Company's contracts, [and] business records.

[DE 1-2 at 4-5]. Conroy agreed that he would not use any confidential information for his own benefit or the benefit of others, nor divulge, reveal, or communicate it to others. *Id.* at 5. He agreed that for one (1) year immediately following the cessation of his employment relationship with XN, he would not compete against XN directly or indirectly, individually or through any corporation, firm, or organization of which he would be affiliated in any manner. *Id.* He promised he would not

> (i) directly or indirectly operate, organize, maintain, establish, manage, own, participate in, or in any manner whatsoever, individually or through any corporation, firm or organization of which he shall be affiliated in any manner whatsoever, have any interest in, whether as owner, investor, operator, partner, stockholder, director, trustee, officer, mortgagee, executive, principal, agent, consultant or otherwise, any other business or venture which engages in the Company's Business, or is otherwise in competition with the Company or any assigns of the Company, unless such activity shall have been previously agreed to in writing by the Company and its successors and assigns. Employee acknowledges that the Company conducts business throughout the United States, and accordingly the foregoing prohibition against competition shall be enforced with respect to the entire United States;

> (ii) sell or solicit any insurance product, good, or other service whether for any purpose related or unrelated to the Company's Business, to any customer, client or insured of Company. For purposes of the foregoing, (A) a customer of the Company shall include any and all person, corporations, partnerships, limited liability companies or other entities that purchase any insurance products and further including all retail and wholesale insurance agencies acting on their behalf as a result of solicitations or other contacts, conducted by persons or entities engaged by or representing the Company (as an employee, agent, officer, independent contractor, or otherwise), notwithstanding that such customers may have been induced to become customers to become customers and to give their patronage to Company by the efforts and solicitations of Employee, or someone

acting on Employee's behalf, regardless of the manner or time of solicitation, and (B) any person or entity to whom the Company has made any proposal for the sale of any product, good or service during the 12 months prior to termination of Employee's employment shall be considered to be a customer, client or insured of Company.

Florida Statute § 542.335 states that restrictive covenants must be reasonable in time, area, and line of business. The party seeking enforcement must prove a legitimate business reason to justify enforcement. § 542.335(1)(b). The restrictions must also be reasonably necessary to protect the legitimate business interests. § 542.335(1)(c). If the moving party can make these showings, then the burden shifts to the nonmoving party to show that the restraint is overbroad, overlong, or otherwise not reasonably necessary. *Id.* The Court must modify restraint if it is overbroad, overlong, or not reasonably necessary. *Id.* The Court should interpret restrictive covenants in favor of providing reasonable protection and should not construe the covenant narrowly, against the restraint, or against the drafter. § 542.335(1)(h).

The statute sets forth examples of legitimate business reasons. *See* § 542.335(1)(b), Fla. Stat. These include trade secrets, valuable confidential information, substantial relationships with specific prospective or existing customers, goodwill, and extraordinary or specialized training. *Id.* XN has alleged several legitimate interests. It has a legitimate interest in its confidential information. XN has a legitimate business interest in its relationships with its existing and prospective customers. It also has a legitimate business interest in its goodwill, which XN argues Conroy is usurping in order to solicit his own clients.

XN has also shown that the restrictive covenants are necessary to protect these interests. Anber testified that its revenues have decreased sharply since Conroy allegedly started to entice

its business away.  He also testified that Conroy used his confidential information and relationship with one of XN's clients to take away the largest single business opportunity that XN had.  The Court finds that the restrictive covenants regarding confidential information and competition are reasonably necessary to protect XN's legitimate interests.

Conroy argued that the insurance products and line slips are commonly known in the insurance industry, and the contact information for the international insurance carriers and Lloyd's Syndicates appearing on those slips is publicly available, so it is not protectable confidential information, citing *Estetique Inc. USA v. Xpamed LLC*, No. 11-Civ-61740, 2011 WL 4102340, at *8 (S.D. Fla. Sept. 15, 2011).  *Estatique* actually stands for the proposition that publically available information, when compiled, can become confidential information. *Id.* at *8-9. Anber testified that at least one insurance product Conroy allegedly gave to stolen clients was a confidential product at this time and had not been made publically available. The Court finds that XN has a right to protect its confidential insurance products that have not yet become part of the public domain.

Conroy objects that the restrictive covenants are overbroad.  XN seeks an injunction that would prevent Conroy from contacting wholesalers, international insurance carriers, and Lloyd's Syndicates.  According to Conroy, the employment agreement only prevents Conroy from contacting XN's customers, clients, or insureds throughout the United States.  Conroy argues that many of these entities are located in the United Kingdom.  Furthermore, wholesalers and retail insurance agencies cannot be construed as customers, according to Conroy, and are not included in the list of legitimate business interests listed in Florida Statute § 542.335 as examples of legitimate business interests.

The Court does not totally agree with Conroy on these points. Reading the agreement carefully, Conroy promised not to compete against XN anywhere in the United States. [DE 1-2 at 8(c)(i)]. He separately promised not to sell or solicit any insurance product, good or service, to any of XN's customers, clients, or insureds, without restriction on location. *Id.* at 8(c)(ii). Wholesale and retail insurance agencies are specifically defined as customers, as are any entities that purchase XN's products. *Id.* Based on the evidence at the hearing, XN's customers are mainly wholesale and retail insurance agencies. The Court sees no overbreadth in enjoining Conroy from contacting the very entities he promised not to contact.

The Court agrees, however, that XN's London brokers and Lloyd's Syndicate members are actually "suppliers," and not customers. Anber testified that XN pays these entities money for access to money to cover any claims. Conroy did not promise not to contact these noncustomer entities. So long as Conroy does not use confidential information to reach out to such entities, he shall not be enjoined from reaching out to them, because including them would make the restraint overly broad.

The Court also agrees that the geographic scope of the noncompete is overly broad. XN testified that it currently only does business in nineteen U.S. states. The Court finds that enjoining Conroy from competing in places in which XN does no business would not further a legitimate purpose of XN. *Cf. AutoNation v. O'Brien*, 347 F. Supp. 2d 1299, 1307 (S.D. Fla. 2004) (granting a one year injunction in areas in which the company competed); *Talk Fusion, Inc. v. Ulrich*, No. 8:11-CV-1134-T-33AEP, 2011 WL 2681677, at *6 (M.D. Fla. June 21, 2011) (finding that a six month restriction applicable to all markets across the United States in which

plaintiff conducts business reasonable). The Court will restrict application of the noncompete to only the nineteen states in which XN actually does business.

There has been no argument that the length of the restrictive covenant is overly long. Restrictive covenants lasting one year can be valid in Florida. § 542.335(1)(d)(1); *AutoNation*, 347 F. Supp. 2d at 1307. Conroy's covenant is set to expire one year after Conroy ceased employment with XN. The Court finds that this length of time is reasonable and enforceable.

There also was no argument that the restrictive covenant was overbroad in line of business. It was the Conroy's obligation to raise this argument. § 542.335(c), Fla. Stat. Nevertheless, the Court does not find restricting Conroy from competing against XN in the insurance business in the places where XN does insurance business overly broad in the line of business.

Having found the restrictive covenants valid, the Court will now move to whether XN has shown that Conroy likely breached the contract. XN has produced evidence that Conroy created Agentis while still employed by XN and that Agentis is selling the same types of products XN sells. It also has shown that Conroy used confidential information about its clients and products, such as a relationship and policy with the American Academy of Anti-Agining Medicine ("A4M"), in order to divert the business to himself. Additionally, XN has evidence that soon after Conroy resigned, one of its clients, A.M.W., executed a change of broker letter changing its broker to a different broker that Conroy had been contacting prior to his resignation. This evidence is sufficient to show a substantial likelihood that XN will prevail on the merits of its breach of contract claim against Conroy.

b.      *Tortious Interference with Business Relationships*

As explained above, tortious interference with advantageous business relationships has the following elements: (1) the existence of a business relationship in which plaintiff has legal rights, (2) knowledge by the defendants of the relationships, (3) an intentional and unjustified interference with the relationship, and (4) damage as a result of the breach of the relationship. *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1177 (11th Cir. 1994).XN had valuable, advantageous business relationships with specific customers it listed in its affidavits and it had a legal right to those relationships.  Conroy knew of these relationships, and a fact-finder could reasonably infer that he shared this knowledge with the corporation he recently formed and that is now directly competing with XN.  Based on Conroy's purposeful outreach to clients that occurred contemporaneously with Conroy's departure from XN, as shown by the computer records analyzed by Deloitte and circumstantial evidence of A4M's acquisition and posting of XN's confidential policy and A.M.W.'s switch to a broker Conroy was emailing, it is reasonable to conclude that Conroy and his new company Agentis were intentionally and unjustifiably interfering with XN's customers.  Intent is further supported circumstantially by XN's evidence that Conroy only resigned after two failed bids to purchase XN's very business that he is now allegedly pursuing separately. Finally, Anber testified that XN has seen a significant drop in business as a result of Conroy's departure.  A fact-finder could find that this business had transferred to Agentis based on circumstantial evidence.  This loss of business damaged XN.

Therefore, XN has shown a substantial likelihood of success on the merits for its tortious interference with advantageous business relationships claims against Conroy and Agentis.[3]

Defendants argue that the mere fact that Agentis hired Conroy with knowledge of his noncompete agreement is insufficient to show tortious interference with Conroy's *contract* with XN, which is a separate claim in XN's complaint. Defendants cite *Fiberglass Coatings, Inc. v. Interstate Chem., Inc.*, 16 So. 3d 836 (Fla. 2d DCA. 2009). That court held that there is no liability for tortious interference by merely employing an individual who is subject to a noncompete agreement with a prior employer. *Id.* at 838-39. Though that may be true, the case does not change the Court's opinion. The *Fiberglass Coatings* court proceeded to hold that an employer could nevertheless tortiously interfere if it was soliciting the former employer's clients through information gleaned from the new employee. *Id.* at 839. That is exactly what XN has alleged Agentis is doing. Therefore, XN has still shown a substantial likelihood of success on the merits against Agentis for tortious interference.

> 2. *Irreparable Harm Absent an Injunction*

Under Florida law, there is a rebuttable presumption of irreparable harm absent an injunction for violating a noncompete agreement. Fla. Stat. § 542.335(1)(j). Even without the presumption, in this case the Court finds that there is actual irreparable harm without an

---

[3] Defendants assert that XN cannot show it is likely to succeed on the tortious interference claims because they are merely another attempt to bring a breach of contract claim. *See Rolls v. Bliss & Nyitray, Inc.*, 408 So. 2d 229, 237 (finding error in allowing compensatory damages for fraud when the actual claim was breach of contract). This argument, however, does not demonstrate that XN will not prevail on either the breach of contract *or* tortious interference claims against Conroy. The Court has found that XN is likely to prevail on both, so even though tort remedies possibly could be inappropriate, XN has a substantial likely of success on at least one claim leading to a preliminary injunction. As to Agentis, the Defendants have argued that there is no contract between Agentis and XN, so the *Rolls* rule would not apply.

injunction.  It would be impossible to determine the extent of damage to XN for loss of

confidential information regarding customers and insurance products and the loss of its

customers. Other courts have found actual irreparable harm in similar cases. *Merrill Lynch,*

*Pierce, Fenner & Smith Inc. v. Dunn*, 191 F. Supp. 2d 1346, 1354 (M.D. Fla. 2002). The Court

finds that Conroy's breach of the noncompete and Conroy and Agentis's tortious interference

would create irreparable harm absent an injunction.

    *3.*       *Balance of the Equities*

    The Court must next evaluate whether the XN's irreparable harm outweighs the harm

Conroy and Agentis will suffer if enjoined.  Conroy voluntarily entered into the noncompete

agreement, so enjoining him according to its terms will cause relatively little, if any,

unbargained-for harm. *See Dunn*, 191 F. Supp. 2d at 1354 (finding the same).  Though Agentis

will be precluded from reaching out to some potential customers, this harm is less than the harm

it allegedly has caused XN by the sudden unfair loss of its customers.  The Court finds that XN's

harm outweighs whatever harm Conroy and Agentis will suffer.

    *4.*       *Public Interest*

    Finally, the Court must consider whether an injunction is not adverse to the public

interest.  Florida has explicitly found that the sorts of interests XN is trying to protect are

legitimate business interests. *AutoNation*, 347 F. Supp. 2d at 1308 (S.D. Fla. 2004) ("As

evidenced by the Legislature's enactment of Section 542.335 of the *Florida Statutes*, public

policy in Florida favors enforcement of reasonable covenants not to compete.").  The public also

has an interest in enforcing contracts and preventing unfair, tortious competition.  The Court

finds that an injunction in favor of XN would not be adverse to the public interest.

## IV. PRELIMINARY INJUNCTION

When a court grants a preliminary injunction, it must state its terms specifically and describe in reasonable detail the act or acts restrained or required. Fed. R. Civ. P. 65(d)(1). The preliminary injunction only binds the parties, their officers, agents, servants, employees, and attorneys, and other persons who are in active concert with one of these entities. *Id.* R. 65(d)(2). The Court will now set forth the terms of the preliminary injunction.

Until December 1, 2012, Conroy and his officers, agents, servants, employees, and attorneys, and other persons who are in active concert with him or one of these entities are enjoined from the following:

(1) Contacting XN's existing clients, customers, and insured parties, including wholesale and retail insurance agencies, but not including international insurance carriers and Lloyd's Syndicates unless he is using confidential information to contact these parties. They shall also be enjoined from contacting XN's prospective clients, customers, and insured parties as described in the preceding sentence to whom the Company has made any proposal for the sale of any product, good or service during the 12 months prior to November 30, 2011;

(2) Using XN's confidential and proprietary information, including using it to compete against XN;

(3) Disclosing XN's confidential and proprietary information to third parties;

(4) Interfering tortiously with XN's advantageous business relationships.

Until December 1, 2012, Agentis and its officers, agents, servants, employees, and attorneys, and other persons who are in active concert with him or one of these entities are enjoined from tortiously interfering with XN's advantageous business relationships.

The geographic scope of the injunction for both Conroy and Agentis is constrained to those nineteen states in which XN actually does business.

Finally, the party moving for a preliminary injunction must provide security for the injunction. *See* Fed. R. Civ. P. 65(c). The court must set an amount that is proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. *Id.* At the hearing, Plaintiff's counsel stated that $25,000 would be an appropriate security. The Court agrees. This preliminary injunction shall be effective upon receipt of the $25,000.00 security.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.     Plaintiff's Motion for Temporary Injunction [DE 5] is **GRANTED**;

2.     Upon receipt of $25,000.00 in security from Plaintiff XN Financial Services, Inc., Defendants Brian Conroy and Agentis Insurance Services, Inc. are **ENJOINED** as described in Part IV of this Order.

**DONE AND ORDERED** in Chambers at Ft. Lauderdale, Broward County, Florida, this 5th day of March, 2012.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies provide to:

Counsel of Record